GARY M. RESTAINO
United States Attorney
District of Arizona
LIZA M. GRANOFF
Assistant United States Attorney
Florida Bar No.: 0159433
CARIN C. DURYEE
Assistant United States Attorney
California Bar 154476
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone:  520.620.7300
Email: liza.granoff@usdoj.gov
Email: carin.duryee@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, <br><br>              Plaintiff, <br><br>    vs. <br><br> Baron Martin, <br>   aka "Convict," <br><br>              Defendant. | CR-25-0190-TUC-AMM-BGM <br><br> GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR REVIEW OF DETENTION ORDER |

The United States of America hereby submits its response to the defendant's motion for review of the magistrate judge's Order of Detention, titled as an "Appeal of Detention Order to District Court." (Doc. 24.) As it is a motion for review, rather than an appeal, of the magistrate judge's detention order the government will refer to it as such.

For the reasons stated in the below Memorandum of Points and Authorities, the defendant cannot rebut the presumption for detention, the Court should deny the defendant's motion for review, and the Court should continue to detain the defendant as a danger to the community.

\\

\\

\\

1

2    <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

3    I.    <u>Facts</u>

4         As alleged in the complaint, the following paragraphs provide background

5    information for an online network of violent extremists known as "764," the role of the

6    defendant, Baron Martin, aka "Convict" (hereinafter Martin), within that network, and

7    Martin's production of child pornography and cyberstalking within the network and other

8    similar networks.

9         "764" is network of violent extremists who engage in criminal conduct within the

10   United States and abroad, with an occult accelerationist goal of bringing about social unrest

11   and the downfall of the current world order. Members of 764 work in concert with one

12   another towards a common purpose of destroying civilized society through the corruption

13   and exploitation of youth. The 764 network individually and as a group methodically target

14   vulnerable, underage populations across the United States and the globe by using known

15   online social media communications platforms to support the possession, production, and

16   sharing of extreme gore media and child sexual abuse material ("CSAM") with vulnerable,

17   juvenile populations.

18        Members of 764 seek to desensitize young people to violence, breaking down

19   societal norms regarding engaging in violence, and normalizing the possession, production,

20   and sharing of explicit CSAM and gore material to corrupt and groom them towards future

21   violence. Individual victims are targeted through synchronized group chats, as members of

22   764 will conduct coordinated extortions of teenagers blackmailing the victims to comply

23   with the demands of the group. These demands vary and include, but are not limited to,

24   self-mutilation, online and in-person sexual acts, harm to animals, sexual exploitation of

25   siblings, acts of random violence, suicide, and murder. Historically, members of 764

26   systematically target underage females, groom them, extort them as a group, and force

27   them to mutilate themselves or others and either film or photograph such activity, at times

28   while streaming it online for the group. The group will then commonly edit compilation

photographs or videos of their victims, share these photographs or videos on their social media platforms to gain notoriety among members of the group, and spread fear among their victims all for the purpose of accelerating chaos under the 764 ideology with an aim towards the disruption of society. The group has shifted names over time and spawned known offshoot groups. Although the group moves between social media channels and changes its name, the core members and goals remain consistent and appear under the overarching threat of 764.

Since approximately 2021, "Convict" has appeared as a participant in chatrooms related to the online networks 764 and "CVLT."[1] CVLT is a 764-related group in that it is an online network of violent extremists known to coerce minors into producing self-harm content, child sexual abuse material, and other gore media. On multiple occasions, Martin has claimed online to be an owner of 764 and CVLT. Martin has also admitted online that he is responsible for teaching 764 members how to extort victims and that he was "the catalyst for thousands of extortions" in 764. Martin referred to himself as the "king of extortion." In 2023, during an unrelated voluntary interview with the FBI, Martin admitted he used the moniker "Convict" on Discord and was aware of groups centered around extortion, child pornography, and forced violence upon animals.

In August 2022, the FBI identified a guide that was posted online which instructed users on how to identify, groom, and extort juvenile females. This manual was circulating among individuals associated with 764 and related groups and was credited to Martin, as Telegram user "Convict." The manual instructed readers to target vulnerable populations such as those struggling with mental health issues, eating disorders or who already self-harm, noting they are susceptible to psychological manipulation. The guide detailed how to groom a female depending on the victim's particular mental health problem. For example, when talking about grooming a female with borderline personality disorder, the

[1] In a recent interview, Martin indicated his participation in the groups began in 2019.

- 3 -

guide advised users to be affectionate and pretend to care about the female at first, but to slowly neglect and be negative "to outright destroy any sense of care that you built for them." In the guide, Martin described how doing this will cause the female to have a "borderline episode" and when that happens, encouraged the reader to "continue to break them down until they seem defeated." Another section of the guide stated, "playing into whatever your victim struggles with will lend you the best results ... You can abuse the dopamine receptors by making them associate cutting with your voice, or you telling them what to do while they're masturbating. This will only build further trust and can add possible blackmail if you're looking to extort the victim. Make sure you archive everything they send you to further add to blackmail, and try to get them to trust you enough that they'll give you their address to 'come over' and see them in the future. This opens the doorway for doxing[2] and extortion."

On or about September 26, 2022, while Martin was residing in Tucson, he engaged in a direct message conversation on social media platform Discord with MV1, a victim whom Martin knew was a minor. MV1 was 13 years old at the time; Martin had turned 18 in June 2022. During their conversations, Martin requested that MV1 cut for him on numerous occasions and threatened to "leak" photos of her if she did not comply. Martin instructed MV1 to cut his name "in every possible place" she could to include her chest, stomach, and thighs. On some occasions, Martin directed MV1 to cut certain designs/phrases into her body to include swastikas, satanic symbols, and the phrase "FUCK 12."[3] Martin often instructed MV1 to make the cuts as deep as she could. MV1 reported she had complied with Martin's demands several times out of fear and sent photos/videos of these cut-signs to him via the internet. At one point in their conversations, Martin

_____

[2] Doxing is the action or process of publishing private or identifying information about a particular individual on the internet, typically with malicious intent.

[3] "Fuck 12" is a phrase that means "fuck the police."

- 4 -

advised MV1 that he wanted her to use a knife and "fuck yourself. with it. with my name." MV1 asked Martin if he wanted her to use the handle of the actual knife and Martin said he wanted her to use the blade. MV1 was reluctant to do so but Martin told her she only had to do it one time. Approximately one day later, Martin messaged MV1, "you stuck a knife in your cunt bitch." When MV1 replied that Martin had no proof, Martin sent a three second video that appeared to show an unidentifiable female removing a knife from her vagina. The video shows the word "Convict" written on the blade of the knife.

MV1 responded to this video with, "STOP. DLETW. EW. omg. omg. omg. stop." Martin replied with, "cope. gonna be there. forever." Later in their conversation, Martin told MV1 he might send the video of her "fucking [herself] with a knife" to another user. This offense conduct is charged as Count 1 in the indictment as a violation of Title 18, United States Code, Sections 2251(a) and (e), Sexual Exploitation of a Child for the Purpose of Producing a Sexually Explicit Visual Depiction.

On or about September 10, 2022, while Martin was residing in Tucson, Martin sent a direct message to MV2, a minor victim whom he had reason to know was under the age of 18. MV2 was 16 years of age. During their chat, Martin told MV2 he angered MV2's boyfriend which caused MV2 to express anxiety and plead with Martin to tell her what was happening. In response, Martin directed MV2 to cut for him. When MV2 told Martin she did not have access to blades because she was at a family member's house to "get clean" from cutting, Martin told MV2 to "break some glass off. so unless you want your life ruined hurry up. ill help you when you're useful to me… figure out a way to draw some fucking blood."

Martin ultimately told MV2 to "scratch yourself with your nails" and to "draw blood." MV2 appeared to comply with Martin's threats and told him she had ripped skin, and that it burned. MV2 appeared to have sent an image to Martin because Martin told MV2 to scratch harder because "i want it dripping." When MV2 told Martin it was burning, Martin told MV2 to pour rubbing alcohol over it. MV2 messaged Martin that she did not know if she could record it because she was shaking too much. Martin then said, "just pour

1    it over the scratches. other arm. the camera lagged."

2        In a separate direct message conversation with another Discord user, Martin sent

3    three videos of what appeared to be this sadistic abuse of MV2.  The videos show MV2

4    scratching her forearm with her nails, causing the skin to become red and raw, and then

5    pouring rubbing alcohol onto the scratches. In one video, MV2 had a rag inside her mouth

6    and was curled up in apparent pain. The video files Martin shared are listed in Count 2 of

7    the indictment in this case, alleging a violation of Title 18, United States Code, Sections

8    2251(a) and (e), Sexual Exploitation of a Child for the Purpose of Producing a Sexually

9    Explicit Visual Depiction.

10        From on or about September 16, 2022, to October 11, 2022, while Martin resided

11   in Tucson, Martin sent threats to MV3, a 13-year-old minor, over Discord. Martin sent

12   these threats to MV3 after MV3's boyfriend posted a dox of one of Martin's internet

13   girlfriends, whom he referred to as "egirls." In a Discord direct message conversation with

14   MV3, Martin told MV3, "sorry for your grandma." When MV3 responded she was not

15   responsible for the dox, Martin admitted that he placed a "hit" under her name and that it

16   was "sad" someone had to get shot because of her. In a separate conversation, Martin

17   explained that the reason he was upset with the dox was because his information was

18   included as well.

19        In separate direct message conversations, Martin solicited others to kill MV3's

20   grandmother.  In one message, Martin stated, "[MV3's boyfriend] literally just called a hit

21   on his girlfriend by posting that dox. im hitting up someone to kill her grandmother. lmao

22   . i need someone in [state]." In a separate conversation, Martin contacted another Discord

23   user and asked:

24        "know anyone in [state]. thats willing to do kidnappings or shootings…i need

25        someone to tobbz[4]  a grandma. Somebody wanted to dox one of my egirls.

26   _____

27

28   [4] Tobbz is a German national who was a close friend of Bradley Cadenhead, the founder
     of 764.  The group's name "764" corresponds to the first three digits of the zip code of

now I'm getting their grandma merked. it'll send a message. and keep them around to tell the story."

When that user said he found someone to carry out the kidnapping and murder for $3,000, Martin agreed to pay the money and sent the address of MV3's grandmother to his accomplice, who indicated he could have "it done soon" and had six people lined up to do the hit. Martin messaged multiple people that he was getting MV3's grandmother kidnapped or shot for $3,000 and told one user he paid for MV3's grandmother to be shot rather than kidnapped because it was "easier."

In a separate server chat, Martin posted the phone numbers of both MV3 and MV3's grandmother and told the group to contact both numbers. Martin also contacted another Discord user and asked him to "groom" MV3 and get "nudes" and/or "any condemning info" of her. In other group chats with MV3, Martin told MV3 that he had her personal information including her address and phone numbers and threatened to swat her home or contact her grandmother. Count 3 of the Indictment encompasses this conduct, which violates 18 U.S.C. §§ 2261A(2) and 2261(B)(a), cyberstalking of a child.

In September 2022, while on a Discord chat, Martin said his ego was high because he knew he could "work with the feds" if he needed to get out of something. Martin said he "dodged manslaughter charges … and when you can talk your way of manslaughter you feel untouchable. I didn't play crazy, I played stupid."

According to the defendant's own father, the defendant was detained as a minor for offenses like those he is currently facing charges for. (Pretrial Services Report, "PTSR", at 2.) The defendant was not charged criminally but his family was urged to place the defendant in treatment, which they did. *Id.* Shortly thereafter, the defendant made bomb threats at his school. *Id.* Again, the defendant was not charged criminally because he was enrolled to attend a wilderness camp in Utah. *Id.* The defendant never completed that

Cadenhead's hometown in Stephenville, TX.

wilderness camp and instead moved to Tucson in May 2022, where he lived at In Balance Transitional Living until October 2022. *Id.* at 4. Based on this timeline, the defendant committed the instant offenses while living at the Tucson rehab facility where he was undergoing treatment.

Since turning 18 and despite being apprehended by police and having participated in some counseling, the defendant has remained active on social media platforms and continued to use them for illegal purposes. In February 2024, he claimed he was "collecting egirls" to start his "army" because he intended to "weaponize women against people we want doxed." In March 2024, he admitted he was grooming a male online and, in other chats, where one user admitted to being 15, with a friend who was 14 and another who was 13, Martin replied they were "too old" and said he was looking for people in the "single digits."

In April 2024, he boasted online that he found a video of a girl that he made "fuck herself with a knife," though it is unclear whether he is referring to MV1 in Count 1 of the Indictment or yet another victim of his efforts. That same month, he sent a photo of a female in her underwear in prayer form with the word "Convict" written on her stomach in what appears to be marker. Martin revealed the girl's name and said she was 12 years old. Another user confirmed the girl's identity and her age.

In separate chats during May 2024, Martin boasted he was a better extorter than anyone, encouraged a Telegram user to kill themselves, and stated he had a whole lineup of people willing to do swats for him for free.

On the phone seized from Martin in December 2024, Martin had saved had videos with the logo "Web Terror" and which displayed multiple photos and video clips of satanic and neo-Nazi imagery, a photo of the Twin Towers burning, and other images related to other terror groups such as "6996" and "The Blood Council." Martin also had saved, in June 2024, a screenshot of a Telegram conversation displaying an unidentifiable female with bleeding cut signs on her groin. Evidence also shows that Martin engaged in multiple messages where he was helping others extort an individual as recently as July 2024.

- 8 -

Prior to his arrest, Martin was attending online cybersecurity courses at Pima Community College. In messages with his father, Martin claimed he used a Virtual Machine (VM) to add security levels to his computer and explained that using a virtual machine prevented "the feds" from getting into his mac computer when he was in Tennessee.[5]

Federal agents are still analyzing the defendant's electronic devices which were seized during the search warrant executed at the home where Martin lived in Tucson prior to his arrest. The facts outlined above will be disclosed to the defense in the Government's disclosure which is currently being prepared.

II.    Procedural History

On December 11, 2024, the defendant was arrested on the filed complaint and arrest warrant. The home in which the defendant was residing was searched pursuant to a lawfully issued warrant.[6] On December 11, 2024, the defendant provided a voluntary post-*Miranda* statement to the FBI wherein he admitted to being user "Convict," claimed ownership of the guide showing users how to groom and extort young female victims, and admitted having been a member of terror groups 764, CVLT, and the like. He claimed he has matured since turning 18 years of age and now wants to help federal authorities prevent the types of crimes he was involved in committing as a juvenile, so has therefore been working on developing an application that would help prevent extortions.

On December 12, 2024, the defendant made his initial appearance before Magistrate Judge Maria S. Aguilera. (Doc. 12.) The defendant requested a continuance of the detention hearing, waived a preliminary hearing, and was temporarily detained. *Id.*

_____

[5] His technical knowledge and use of technology to avoid detection also increases his risk to the community, as it shows that he would be very difficult to successfully monitor if released.

[6] Over 25 electronic devices were seized from the home and federal agents are diligently analyzing said contents.

On December 19, 2024, the defendant's continued detention hearing was held by Magistrate Judge Jacqueline M. Rateau. (Doc. 17.) The defendant again requested a continuance to determine housing and another continuance was granted over the government's objection. *Id.* He was again temporarily detained. *Id.*

On January 8, 2025, the defendant was indicted by a federal grand jury and charged with two counts of production of child pornography and one count of cyberstalking of a child. *See,* Doc. 21. His arraignment is scheduled for January 31, 2025, with a plea deadline of February 21, 2025, and trial set for March 11, 2025. (Doc. 19.)

On January 10, 2025, a further detention hearing was held before Magistrate Judge Maria S. Aguilera. (Doc. 22.) In its latest addendum dated January 8, 2025, Pretrial Services continued to recommend detention. At the hearing, the defendant's counsel argued for release. The government advocated for detention pending trial due to safety concerns. Judge Aguilera ultimately found the presumption for detention applied, found the defendant failed to rebut the presumption for detention, and ordered the defendant's detention pending trial as a danger to the community. (Doc. 23.) The magistrate judge concluded there were no conditions that existed which could keep the community safe from the defendant if he were released.

On January 15, 2025, the defendant filed his motion for review before the district court. (Doc. 24.)

III.    Law and Argument

A party may seek review of a magistrate judge's order regarding detention under 18 U.S.C. § 3145(a)(1).   In conducting the review, the district court should "make its own independent determination whether the magistrate's findings are correct, with no deference. … [T]he ultimate determination of the propriety of detention is also to be decided without deference to the magistrate's ultimate conclusion." *United States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990).

A.    The Defendant Has Not Overcome the Presumption of Detention Under the Bail Reform Act.

Once the government makes a motion for detention, the court must determine, as an initial matter, whether defendant has been charged with one of the enumerated crimes, presents a risk of flight, or presents a risk of obstruction of justice. *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988); *United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999). Here, the defendant has been charged with one of the enumerated crimes that carries the presumption for detention, and he presents a risk of danger to the community.

Subject to rebuttal by the defendant, the Bail Reform Act states that it "shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed … an offense involving a minor victim under section … 2251." 18 U.S.C. § 3142(e)(3)(E). The defendant has been so charged, and probable cause has been so found to exist. As such, the presumption for detention applies to the defendant. Though the burden of persuasion stays with the United States, this presumption puts the onus on the defendant to *produce evidence* that he is not a danger to the community. *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008) (emphasis added). "The presumption is not erased when defendant proffers evidence to rebut it; rather the presumption 'remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence or relevant to factors listed in § 3142(g).'" *Id.* (quoting *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986)). Here, the defendant has not produced any evidence that he is not a risk of danger to the community.

The government's burden of proof on dangerousness is clear and convincing evidence. *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991). The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "the danger that the defendant might engage in criminal activity to the detriment of the community." *United States v. Millan*, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

The government's burden of proof on flight risk is preponderance of the evidence. *King*, 849 F.2d at 489 (citing *United States v. Medina*, 775 F.2d 1398, 1402 (11th Cir. 1985). Where the evidence of guilt is strong, it provides "a considerable incentive to flee." *Millan*, 4 F.3d at 1046; *see also United States v. Palmer-Contreras*, 835 F.2d 15, 18 (1st Cir. 1987) (per curiam) (where "the evidence against defendants is strong, the incentive for relocation is increased.") Additionally, the possibility of a severe sentence is an important factor in assessing a defendant's likelihood of flight. *See United States v. Martir*, 782 F.2d 1141, 1147 (2d Cir. 1986) (defendants charged with serious offenses whose maximum combined terms created potent incentives to flee).

B.    The Bail Reform Act Factors Weigh in Favor of Detention.

Application of the Bail Reform Act factors under Section 3142(g) yields the same conclusion that the magistrate reached: this defendant is a danger to the community. The Bail Reform Act lists four factors to be considered in the detention analysis, whether for risk of flight or dangerousness: (1) the nature and circumstances of the crimes charged; (2) the history and characteristics of the defendant; (3) the seriousness of the danger posed by the defendant's release; and (4) the evidence of the defendant's guilt. 18 U.S.C. § 3142(g); *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985.) *See also*, *Gebro,* 948 F.2d at 1121. All four factors weigh in favor of the defendant's detention.

The first Bail Reform factor to be considered during review of a detention order is the nature and circumstances of the charged offenses, which the defendant ironically failed to include in his motion for review. The defendant is charged with production of child pornography and cyberstalking. Consideration of the offenses charged also involves consideration of the penalties. *See, United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990.) The seriousness of Martin's offenses is reflected in the penalties he faces - two separate mandatory minimum sentences of 15 to 30 years in prison on Counts 1-2, and a maximum penalty of 10 years on Count 3. The very nature and circumstances of the charged offenses weigh in favor of detention.

The second factor the Court must consider under the Bail Reform Act is the weight

of the evidence against the defendant. The overwhelming evidence that the defendant committed the charged offense, and the associated likelihood of a lengthy sentence also weigh in favor of pre-trial detention. The evidence in this case includes numerous admissions by Martin via social media platforms and multiple statements to law enforcement regarding knowledge and intent. Combined with the ample chats and digital evidence which document his crimes, the evidence in this matter provides a powerful incentive to flee. "When faced with the possibility of a significant prison term, defendants have a strong incentive to flee." *United States v. Edwards*, 2021 WL 796089, at *2 (E.D.N.Y. Mar. 2, 2021). *See also United States v. King*, 849 F.2d 485, 488 (11th Cir. 1988) (defendant was a flight risk where she faced numerous mandatory minimum 10-year sentences); *United States v. Cisneros*, 328 F.3d 610, 618 (10th Cir. 2003) (the defendant was a flight risk because her knowledge of the seriousness of the charges against her gave her a strong incentive to abscond); and *United States v. Khusanov*, 731 F. App'x 19, 21 (2d Cir. 2018) ("[A] district court does not clearly err in concluding that a defendant facing a potentially lengthy prison sentence possesses a strong motive to flee.")

If convicted, Martin faces two separate mandatory minimum sentences of 15 years, and up to 30 years imprisonment for each offense of child exploitation by way of production of child pornography. The possibility of a severe sentence—including a sentence lower than the one the defendant faces—can establish risk of flight. *See United States v. Scali*, 738 F. App'x 32, 33 (2d Cir. 2018) ("The court reasonably determined that [the defendant]'s Guidelines range of 87-108 months' imprisonment was significant enough to provide an incentive to flee.")

Here, the defendant's lack of criminal convictions does not overcome the presumption that he is a flight risk. The defendant has a powerful incentive to flee given that he faces significant prison sentences and now knows the strength of the government's evidence. Moreover, he is also aware that other members of 764 have recently received sentences from 30 to 87 years in prison. Finally, there are indications in the Pre-trial services report about prior mental health conditions which suggest a risk of non-

1  appearance.

2        The third factor relevant to determining detention is the defendant's history and

3  characteristics. The defendant does not have any criminal history, but he does have a

4  history of law enforcement contact for harming victims as a juvenile and was given a

5  chance to rehabilitate after being caught for such conduct. Despite having had his family's

6  support at that time and allegedly participating in counseling, a residential program, and a

7  stay at In Balance in Tucson, he continued to engage in illegal conduct. His decisions show

8  he was not deterred at all.

9        Moreover, even apart from the squandered past opportunities to rehabilitate and stop

10 harming children online, the brazen conduct charged in this case supports his detention. He

11 has caused unmitigated damage to multiple minor victims, continues to engage in this

12 conduct, and seeks to groom children now in the "single digits," while boasting that he is

13 able to manipulate law enforcement – and now the Court – by, in his words, playing

14 "stupid." He has directly threatened victims, claimed to have kidnapped one of his victims,

15 and engaged in a murder for hire plot to kill and kidnap a minor victim's relative.

16 According to one of his minor victims and chats recovered from Martin's Discord account,

17 he also forced a minor victim to torture and ultimately kill a pet hamster during a

18 livestream. His blatant and horrific behavior during the past few years speaks volumes

19 about his character and shows that he is either not interested or not capable of changing his

20 ways. Detention is required to protect the safety of the community and secure his

21 appearance to face the charges here.

22        The fourth and final factor under the Bail Reform Act is danger to the community,

23 which is amply addressed above. Because he faces decades in mandatory minimum

24 sentences and the evidence is strong here, the defendant may decide he has nothing to lose

25 by either committing other crimes if he is released. He has previously tricked many

26 children into committing heinous crimes and harming themselves, and in one case, a pet.

27 He has encouraged others to commit suicides and has boasted he has many deaths in his

28 tally.

The defendant prides himself on being manipulative and skillful in his cyber knowledge. He has thus far shown no limits as to what he is willing and capable of doing to youth he can manipulate. If released pending trial, there is also a risk he will try to communicate with his victims and witnesses and threaten them with further harm. The government and law enforcement believe he poses a grave risk to the safety of the community and his victims.

All four factors under the Bail Reform Act weigh against the defendant's release, both as a risk of nonappearance and a danger to the community. This Court should order defendant's continued detention pending trial.

IV.    Conclusion

In sum, the detention order by the magistrate judge appropriately assures the defendant's appearance at trial and safety to the community. The Government agrees with Pre-Trial Services that there are no conditions of release that would assure the defendant's future presence in court and keep the community safe from further crimes by the defendant. The defendant did not overcome the presumption for detention under the Bail Reform Act before the magistrate judge and fails to do so now. Accordingly, the United States respectfully moves the Court to deny the defendant's motion for review without hearing and affirm the magistrate judge's order of detention.

Respectfully submitted this 27th day of January 2025.

GARY M. RESTAINO
United States Attorney
District of Arizona

*s/Liza M. Granoff*

LIZA M. GRANOFF
CARIN C. DURYEE
Assistant U.S. Attorneys

Copy of the foregoing served electronically or by
other means this 27th day of January 2025, to:

All ECF Recipients

- 15 -